DIXON, Judge.
This case arose out of a collision in which the plaintiff was injured. He crashed into a truck at an intersection and claims that the accident was caused by the negligence of the defendant, Gayle Smith, in failing to observe his right of way and pulling out in front of him as he approached. Gayle Smith was the eighteen year old wife of a soldier, traveling to meet her husband in Texas.
The intersection involved is the junction of 1-20 and Highway 80 near Minden, Louisiana. Highway 80 is a divided pavement four-lane highway, as is 1-20. Both highways run in a general east-west direction. A traveler on Highway 80 headed easterly has a choice of continuing on Highway 80, or turning slightly to the right and following 1-20. Westbound travelers on 1-20, in order to continue in a westerly direction, must cross the eastbound lane of Highway 80 and turn to the left on the westbound lane of Highway 80.
Although the evidence is conflicting, it was established by a preponderance of the evidence that the intersection was controlled by stop signs and flashing red and yellow lights. The stop sign and the flashing red light were located to bring to a halt westbound traffic on 1-20, before proceeding in a westerly direction on Highway 80. The flashing yellow light was hung to warn motorists on Highway 80 of the intersection.
The accident occurred on February 10, 1967, a clear day, a short time after 4:00 o’clock in the afternoon. The plaintiff Haire, twenty-four years old at the time of the trial, was employed at the Louisiana Army Ammunition Plant. When his shift ended at 4:00 p. m., he drove his car from the parking lot on to Highway 80 and headed easterly toward Minden. As he approached the intersection with 1-20, the defendant, Gayle Smith, pulled out into the intersection; Haire lost control of his automobile, skidded and crashed into another vehicle waiting at the intersection.
This case was consolidated with Aetna Casualty & Surety Company v. Smith et al. 224 So.2d 536, for the purposes of trial. Aetna was the collision insurer of Haire and sought to enforce its subrogation against the defendants.
There was judgment in the trial court rejecting the demands of the plaintiff. The trial court found that plaintiff’s speed was excessive, that he failed to keep his vehicle under control, and that his negligence was a proximate cause of the accident.
The plaintiff has appealed; the defendants answered the appeal, to fully protect themselves.
*533 A review of the evidence convinces us that the accident was caused by the negligence of Mrs. Smith, and that the defendants have failed to sustain the burden of proving contributory negligence on the part of the plaintiff Haire.
The plaintiff Haire remembers nothing about the accident, nor about the events which occurred before or after the accident.
Except as to Haire’s speed, the testimony of the witnesses to the accident was not greatly conflicting. (The maximum legal speed limit was seventy miles per hour). Gayle Smith, the defendant, testified that when she first saw the Haire automobile, it was “right on top of me.”
Gayle Smith’s passenger was Mrs. Sherry Gentry, eighteen years old at the time of the trial and the wife-of a soldier. She said Mrs. Smith stopped at the intersection, started off, "and then I happened to see this car coming and I spoke to her and told her that there was a car coming, so she stopped again and the car was going real fast and all.” She estimated Haire’s speed at seventy or eighty miles per hour.
John Brown was a Negro man who was employed at the same place where the plaintiff worked. He and Mr. Haire left their place of employment about the same time. He testified that Haire turned right on Highway 80, headed toward Minden, just ahead of Brown. Brown followed him in the outside lane at about fifty miles an hour. He said that Haire’s automobile remained a constant distance ahead of him until the time of the accident. Brown testified that a car (Mrs. Smith’s) pulled out in front of Mr. Haire. Brown said that Haire was located twenty or twenty-five feet from a point in the highway when defendant’s automobile pulled out in front of him; this point in the highway was a subject of confusion. Brown was cross-examined in an effort to clarify his testimony and it became apparent that Brown was about fifty yards behind Haire, and that when Brown was approximately in the intersection of the eastbound lane of Highway 80 with the eastbound lane of 1-20 (and perhaps twenty or twenty-five feet beyond) a car pulled out in front of Haire. A plat of the intersection was introduced in evidence. It shows that the distance between the intersection of the eastbound lane of Highway 80 with the eastbound lane of 1-20 to the point where the eastbound lane of Highway 80 intersects the westbound lane of 1-20 is nine hundred seventy-five feet. Brown testified that after the accident it was impossible to open the door to the Haire automobile. A pulpwood truck stopped. Its Negro occupants produced a metal bar with which the automobile was opened sufficiently to remove the unconscious Haire from the wreckage. It is apparent that the trial judge confused the testimony concerning the two different trucks occupied by Negroes. John Brown did not give his name to the state trooper investigating the accident, and the trial court apparently concluded that John Brown was not present and disregarded his testimony. Some witnesses testified that Negroes arrived at the scene of the accident in a truck after the accident had already happened. That truck, however, was a pulpwood truck and was the truck from which the metal bar was taken to prize open Haire’s automobile. (The trial judge did not have the benefit of briefs nor the transcript of evidence, delayed a decision until he had read depositions filed in evidence during the trial on November 14, 1968, and filed a written opinion on December 3, 1968).
Matthew A. Self was with his partner William Bamburg and was driving a pickup truck on 1-20 headed toward Shreveport. He came to the intersection of 1-20 and Highway 80, pulled up and stopped. After he stopped, the defendant, Mrs. Smith, pulled around him in the lefthand lane and went into the intersection of Highway 80. The young ladies were followed at this point by the DeWitt Hatch *534 ery truck (a vehicle that had the appearance of a school bus). Mr. Self testified that the ladies did not stop at the intersection, but moved out into “the middle of the street and hesitated, almost stopping.” At this time, Self said the defendant had one lane of Highway 80 blocked. He saw Haire maneuver his automobile and go into a skid. He estimated Haire to be up the road about three-eighths of a mile when he first saw him, and he estimated Haire’s speed to be in excess of eighty miles per hour. It was in an examination of the witness Self by the trial judge that it became apparent that the witness Self was confused about John Brown, his pickup truck, and the other Negroes in the pulpwood truck who arrived after the accident.
The witness Bamburg, a passenger in Self’s pickup truck, testified that the young ladies did not stop at the intersection, but drove into the highway and hesitated. Bamburg said that Self tried to put his truck into reverse and said, “My God, ladies get out of the road,” just before the accident. Bamburg said that he first saw Haire about one hundred fifty yards or two hundred yards away from him, blinking his lights. He estimated Haire’s speed to be in the neighborhood of about eighty or ninety miles per hour.
Griffin Willis was the operator of the hatchery vehicle. He first saw Haire out of control going into a skid at a speed he estimated to be about sixty miles per hour. He said the defendant’s automobile “stopped for just a minute and proceeded” into Highway 80; and when about half way across, the car hesitated a moment and “sped on.” It was at this time that Willis first saw the Haire automobile.
The testimony of the investigating trooper indicated that plaintiff left Highway 80 and skidded about ninety feet to the point of his collision with the truck. The witnesses who were able to observe plaintiff’s maneuvers just prior to the accident agreed that tie seemed to start to his left, as if to cross in front of the Smith vehicle blocking his path, and then changed direction and started to his right, as if to go behind the Smith vehicle. The trooper testified that the evidence at the scene of the accident showed that Haire left the hard surface of the highway, hit the shoulder, skidded on gravel and the asphalt portion of the 1-20 exit. The occupants of the hatchery truck and the pickup truck testified about the shower of gravel which accompanied the collision. There can be no doubt that Haire was faced with a sudden emergency.
The witnesses who were at the intersection as Haire approached were all convinced that he was traveling at a high rate of speed. Bamburg himself estimated Haire’s speed to be as great' as eighty or ninety miles per hour. The operator of -the hatchery vehicle which was struck by Haire’s automobile estimated Haire’s speed at sixty miles per hour as he began his skid. Mrs. Smith did not see Haire in time to estimate his speed.
All of these witnesses observed Haire as he bore down upon them at an angle substantially less than ninety degrees. On the other hand, John Brown was traveling behind Haire. His testimony that Haire did not exceed fifty miles an hour was unimpeached. The circumstances of the accident were such that Haire might easily have lost control of his automobile even if he had been going at a substantially slower speed. The evidence is clear that Mrs. Smith did not see Haire approach, pulled into the intersection, hesitated, blocking the path of approaching traffic, and then sped to safety.
Appellees argue that an appropriate speed at this intersection for the plaintiff Haire would have been forty miles an hour, because it was controlled by the flashing signals.
*535 Louisiana Revised Statutes, 32:234 provides:
“§ 234. Flashing signals
“A. Whenever an illuminated flashing red or yellow signal is used in a traffic sign or signal, it shall require obedience by vehicular traffic as follows:
"(1) FLASHING RED (STOP SIGNAL)—When a red lens is illuminated with rapid intermittent flashes, drivers of vehicles shall stop before entering the nearest cross-walk at an intersection or at a limit line when marked, or, if none, then before entering the intersection, and the right to proceed shall be subject to the rules applicable after making a stop at a stop sign.
“(2) FLASHING YELLOW OR AMBER (CAUTION SIGNAL)—When a yellow lens is illuminated with rapid intermittent flashes, drivers of vehicles may proceed through or past such signal only with caution.”
It is to be noted that this intersection was controlled by both red and yellow signals. The intersection was a familiar one to Mr. Haire. He knew that the flashing red signal for 1-20 drivers required that they stop before entering Highway 80. There is evidence that he did exercise care, as required for a driver proceeding through an intersection controlled by the flashing yellow signal; a witness remembered that Haire flashed his headlights as he approached the intersection and as Mrs. Smith was proceeding into it. Haire did attempt to bring his automobile under control, and did succeed in avoiding the vehicle which blocked his path (at the expense of damage to himself and to other vehicles near the intersection).
Appellees’ brief relies heavily on the capacity of plaintiff’s automobile for speed. It was a new “sport” model of a popular manufacturer, with a large and powerful engine. The capacity for speed is not proof of speed.
The evidence is not sufficient to support the burden of proving that a proximate cause of the accident was either plaintiff’s speed or plaintiff’s failure to keep his car under control.
This conclusion makes it necessary to consider plaintiff’s injuries and his claim for damages. Plaintiff suffered a head injury, multiple lacerations and brush burns, rib injuries, and a fracture of the pelvic bone. He suffered a concussion, and was unconscious until the day following the accident. He was hospitalized in Minden for three days and in Shreveport for six. His head injury required an additional brief period of hospitalization.
The plaintiff was in bed at home for about two weeks and on crutches for about three weeks. He returned to work on April 4, 1967, and was placed on light duty. After he returned to work it was discovered that there were some pieces of glass embedded in his arm, requiring surgical removal.
At the time of the trial, the plaintiff testified that he tired easily and continued to suffer some numbness and stinging in his leg. His work required that he stand, and he was able to do six or eight hours work all right, but overtime work gave him considerable discomfort.
The orthopedic surgeon found two transverse fractures in the ischium and pubis. He evaluated the plaintiff after an examination on July 9, 1967, and concluded that Haire still had some disability. He said, “It is not a normal leg.” He said Haire’s residual disability would be permanent.
The plaintiff lost $717.12 in wages. The doctor and hospital bills, the deductible portion of the automobile damage, the other bills incurred directly because of the injury, and the lost wages totaled *536 $2,350.45. We think an award of $10,000.-00 would adequately compensate the plaintiff for his injuries.
For these reasons, the judgment of the district court is reversed, and it is now decreed that there be judgment in favor of the plaintiff, Thomas Edward Haire, and against the defendants, Allstate Insurance Company and Gayle Smith, in solido, in the full sum of $10,000.00 with 5% interest from date of judicial demand until paid, and all costs of this suit.